Andrew Newman, Inc. v. Commissioner.
Andrew Newman, Inc. v. Commissioner
Docket No. 59812.
United States Tax Court
T.C. Memo 1957-224; 1957 Tax Ct. Memo LEXIS 24; 16 T.C.M. (CCH) 1018; T.C.M. (RIA) 57224; December 9, 1957
*24 Philip A. Brenner, Esq., for the petitioner. Emil Sebetic, Esq., and John A. Dunkel, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined the following deficiencies in income tax: Year Ended Sept. 30
Deficiency
1950
$3,813.25
1951
3,099.12
1952
3,206.26
The questions for decision are whether the petitioner may properly depreciate the cost of a covenant not to compete over the term of the covenant and, if so, what is the proper rate of depreciation. Other issues are dependent upon the answers we give to the above questions and can be settled by adjustments under a Rule 50 computation. Findings of Fact The stipulated facts are so found and the stipulation and pertinent exhibits are included herein by reference. Petitioner Andrew Newman, Inc., is a corporation organized December 4, 1947, and existing under the laws of the State of New York. It maintains its principal office at 153 East 52nd Street, New York 22, New York. The returns for the taxable years 1950, 1951, and 1952, involved herein, were filed with the collector of internal revenue for the third district of *25 New York. Mack Gershen (hereafter called Gershen), president and sole stockholder of petitioner, had been a musical conductor and arranger for over 20 years prior to 1947, and had also, prior to December of 1947, been in partnership for several years, with his brother and father, in a business called Vangaard Military Equipment. During the latter part of 1947, Gershen, who had no previous experience in the dry cleaning business, at the urging of friends in the theatrical world, decided to enter the dry cleaning business in the hope of capitalizing on the potential patronage of his numerous friends among show people. After exploring various possibilities, it was decided that Andrew Newman's (hereafter Newman) dry cleaning business would be most desirable. Newman's business was substantial, with gross sales of approximately $200,000 per year, as compared to annual volumes ranging from $35,000 to $65,000 for a majority of dry cleaning establishments in the greater New York area. During the latter part of 1947 there were only approximately 15 dry cleaners in the greater New York area with a volume of business over $100,000 a year. Newman's business included both cash and carry business *26 from customers coming in off the street and truck pickup and delivery business on the East side of Manhattan and Forest Hills, New York. Gershen's friends introduced him to Walter Rosenberg (hereafter Rosenberg), an accountant for the purpose of assisting him in acquiring Newman's business. After a preliminary discussion with Newman, Rosenberg made an examination of Newman's books and records, and reported to Gershen that: it was a nice business; had many customers, very fine people; did a business up and down Park Avenue, Fifth Avenue, and other high-income neighborhoods; that Newman wasn't making too much money; that the chattels, equipment, trucks, and so on were worth from $40,000 to $50,000, and that good will was worth about $10,000. After receiving Rosenberg's report, Gershen again discussed the matter with his friends who were of the opinion that the business could be developed provided that Newman could be kept from competing with Gershen. Gershen was advised to ask for a restrictive covenant to cover a large area in order to protect his proposed investment in the business and the expansion in its operations which he planned to bring about. Gershen proposed to Newman *27 to buy his business if Newman would agree not to engage in a similar business for 10, 15, or 20 years. They finally decided upon a 10-year term. Newman asked $100,000 for such an agreement. Gershen offered him $50,000. They bargained back and forth and finally settled upon the sum of $75,000 as the price for the covenant not to compete. The covenant not to compete was treated by the parties to the sale as an element separate and apart from the assets and good will of the business owned by Newman. Gershen understood a covenant not to compete as follows: "It is to restrict a man from going into a business. To restrict a man from competing with you." On December 29, 1947, when the sale took place, petitioner and Newman entered into two contracts and petitioner executed a chattel mortgage. Exhibit 1-A to the Stipulation of Facts lists the assets sold and conveyed, but not the consideration paid therefor. Exhibit 2-B recites that it was executed simultaneously with Exhibit 1-A and shows $125,000 paid as consideration, of which $35,000 was paid on closing, and the balance of $90,000 was secured by the chattel mortgage payable in monthly installments. Exhibit 2-B reads in part: *28 "1. The parties hereby agree that the said consideration for said sale shall be divisible as follows: "Forty Thousand ($40,000.00) Dollars for chattels, fixtures, machinery, automobiles, etc. described in the bill of sale executed by Andrew Newman to Andrew Newman, Inc. this day. "Ten Thousand ($10,000.00) Dollars for good will of the business and establishment. "Seventy-Five Thousand ($75,000.00) Dollars for the restrictive covenants hereinafter entered into by Andrew Newman for the benefit of Andrew Newman, Inc., its successors or assigns to be paid as follows: - "Fifteen Thousand ($15,000.00) Dollars in monthly installments during the first year commencing April 1, 1948 and "Twenty Thousand ($20,000.00) Dollars each year thereafter in monthly installments until the full sum of Seventy-Five Thousand ($75,000.00) Dollars shall have been paid with interest as set forth in the aforesaid chattel mortgage." Exhibit 2-B further provides that Andrew Newman will not in any manner whatsoever endeavor to solicit the customers of the establishment located at 153 East 52nd Street, New York City. Exhibit 2-B also provides, in part: "The seller further agrees that he will not, *29 for a period of ten (10) years from the date hereof, within the State of New York, but limited to the territory within a 75-mile radius from 153 East 52nd Street, Manhattan, New York City, - within the State of New York - directly or indirectly, * * * "(1) Use the name 'Andrew Newman' * * * "(2) Engage in the business of cleaning, repairing, dyeing, storing, laundering, or servicing of garments, wearing apparel, furniture covers, drapes, curtains, furniture, furs * * *" Gershen had requested the restrictive covenant to cover an area within a radius of 75 miles, because Newman had serviced a limited area, whereas, Gershen planned to service an area 40 to 50 miles beyond the area serviced by Newman. The customary restrictive covenant issued in a sale of a dry cleaning establishment in New York covers an 8-block radius from the store sold, sometimes a 10 to 12-block radius. The restrictive covenant in this transaction would have had the practical effect of compelling Newman to move out of the area in which he was living if he wished to reestablish himself in a cleaning business. Newman who was in his middle forties when the sale was made had been in the dry cleaning business *30 all of his life. He also had two brothers who had dry cleaning stores, and the restrictive covenant was designed, among other things, to prevent him from going into business with his brothers. The negotiations which culminated in the sale herein were carried on by the parties at arm's length. The documents evidencing the sale were drawn up by the attorney for Newman. The price of $75,000 for the restrictive covenant was paid in four years, and was amortized by petitioner over a period of six years, as follows: Period Dec. 27, 1947 through Sept. 30,
1948
$16,875
Fiscal Year Ended Sept. 30, 1949
16,875
Fiscal Year Ended Sept. 30, 1950
11,250
Fiscal Year Ended Sept. 30, 1951
11,250
Fiscal Year Ended Sept. 30, 1952
11,250
Fiscal Year Ended Sept. 30, 1953
7,500
In each of the years before us the petitioner claimed the amount of $11,250 as a deduction as part of "selling expense." For the year ended September 30, 1948, the petitioner deducted $16,875 as selling expense and claimed a net operating loss carry-over to the year ended September 30, 1950, based thereon. The Commissioner disallowed these claimed deductions and the loss carry-over, explaining *31 as follows: "it has been determined that such deductions represent a portion of a restrictive covenant inseverable from goodwill and therefore non-amortizable." Opinion The ramifications into which varying fact situations may lead in cases involving the sale of businesses together with good will and covenants not to compete are readily apparent from the analysis of the problems recently made in Richard Ullman, 29 T.C. - (October 28, 1957). As pointed out there difficulty often exists in separating the covenant not to compete from good will and this is particularly true in cases where the covenantor is the proprietor of the business being sold and as such has a direct proprietary interest in the good will. That is the situation here. However, it seems to be established that if an agreement not to compete can be segregated and we can be assured that it has actually been dealt with as a separate item in the transaction so that a severable consideration for it can be shown, the covenantee is entitled to amortize the consideration paid for the covenant. , and see . Under the facts of this case *32 we think that this has been shown. The parties negotiated the sale at arm's length. A covenant not to compete was particularly sought by Gershen; it was dealt with as a separate item; its duration and the consideration to be paid for it were the subject of bargaining between the parties; and its provisions were more severe than those of covenants not to compete usually made in connection with the sale of similar businesses. Accordingly, the petitioner may properly amortize the cost of the covenant not to compete. ; , affd. (C.A. 10). The remaining problem is the amount which may be amortized in each of the years involved. The covenant was for a 10-year period. In the ordinary case the cost of the covenant would be amortizable ratably over the term of the contract. ; The petitioner here contends, however, that the method of amortization which was used as set forth in our findings of fact and which resulted in complete amortization of the consideration paid for the covenant in six years, is *33 reasonable and should be approved. This contention is based on the testimony of the petitioner's accountant who testified: "It has been my belief, and it was done with thought and consideration, that when a man buys a business, the greatest harm can be done in the first short period, possibly six months or a year, possibly two years as he grabs hold of the business, as he becomes acquainted, the value of that risk wanes and the damage he can do is less and less and less. * * *" Such testimony has some theoretical appeal for the method of amortization used by the petitioner. However, no facts appear in the record which would demonstrate the reasonableness of the method in the case before us. The petitioner bargained for a 10-year covenant. That is what he got and in the absence of any evidence to the contrary the covenant presumably had a depreciable life over its entire term. Nor have we found any case law which would permit a covenant not to compete to be amortized on a so-called declining useful life method rather than ratably. In the circumstances, we hold that the petitioner is entitled to charge off the $75,000 paid for the covenant ratably over its term; that is, at the rate *34 of $7,500 per year for 10 years. Decision will be entered under Rule 50.